# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: AUGUST 26, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0579-MR

MICHAEL CRAIG MOODY        APPELLANT

ON APPEAL FROM HARDIN CIRCUIT COURT
HON. KELLY MARK EASTON, JUDGE
INDICTMENT NO. 18-CR-1277

V.

COMMONWEALTH OF KENTUCKY        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

This case comes before the Court on appeal as a matter of right[1] by Michael Craig Moody (Appellant), from the judgment and sentence of the Hardin Circuit Court. After a jury trial, Moody was found guilty of first-degree robbery and possession of a handgun by a convicted felon. Additionally, the jury determined that Moody was a persistent felony offender, second degree. The Circuit Court imposed a concurrent sentence of ten (10) and thirty (30) years for a total of thirty (30) years, and Moody timely appealed.

Moody puts forth only two arguments. First, he argues that the trial court improperly allowed prior bad acts to come before the jury as character

---

[1] Ky. Const. § 110(2)(b)

1

evidence, violating KRE[2] 404(b). Second, he argues that the Commonwealth improperly defined "reasonable doubt" during the voir dire of the jury in violation of RCr[3] 9.56(2).

For the following reasons, we affirm.

## I. Factual and Procedural Background

On October 25, 2018, Moody and his girlfriend, Joey Lynn Smith, visited the Belk department store in Elizabethtown. Smith entered the store initially by herself whereupon Alison Backstrom, an employee of Belk, contacted Belk's Regional Loss Prevention Officer, Theron Rowe. Backstrom's call was predicated upon her recognizing Smith from the week prior.

On the prior occasion, Backstrom witnessed Smith placing items in her purse while shopping. No loss prevention officer was on duty, so Backstrom proceeded to closely follow Smith around the store under the guise of providing customer service. Eventually, Smith removed the items from her purse and dropped them on the floor. She made her way to Moody and the two exited the store together. It was this incident that led to Backstrom recognizing both Smith and Moody on October 25, 2018.

During the second visit to the store, it was Rowe who kept a close watch on Smith although he did not feign an offer of customer service. Instead, Rowe was content to observe Smith until she attempted to leave with unpaid-for items. He watched her enter a fitting room with several pieces of clothing and a

---

[2] Kentucky Rules of Evidence
[3] Kentucky Rules of Criminal Procedure

2

luggage carrier. Upon leaving the fitting room, Smith made for the exit. As she approached the cashier check-out, Rowe identified himself as security and demanded she stop. She did not. Rowe then grabbed Smith and the two began to struggle.

Simultaneously with the events just described, Moody had been waiting in his van. After some time—Moody says approximately thirty-five minutes—he entered the store to look for Smith. Rowe saw Moody enter and believed him to be looking for someone, although it did not occur to him that Moody was looking for Smith. Unable to find Smith, Moody again went back to his van. Almost immediately after he left the store is when Smith made her attempt to leave Belk, initiating the struggle between her and Rowe.

Moody testified that he heard Smith scream. At this time he was approximately sixty (60) feet from the store entrance. He went to the van, drove it closer to the Belk entrance, and there a woman told him the police had been called. Unswayed, he grabbed Smith's handgun from the van and proceeded inside the store to her defense. Moody stated that he was unaware of Rowe's position as a Loss Prevention Officer; he did not see or hear him identify himself as such, and therefore only saw a man in civilian-clothing accosting Smith. He pointed the gun at Rowe's head and demanded he release her. Rowe promptly did so. Moody and Smith then left the store, fled the scene, but were soon thereafter pulled over and arrested in Elizabethtown.

At trial, during voir dire, the Commonwealth made a statement to the jury, which we quote in full:

3

We talk about, the standard is beyond a reasonable doubt, alright? I cannot define that for you, nobody can. The courts have said no. Everybody here understands I did not say beyond any doubt, correct?

Okay, I'm going to give you an example, alright? I'm not much of a golfer. I used to play a lot before I started doing this job then I don't play so much. I know Ms. Pearl's husband is quite the golfer. Who here knows Tiger Woods? Pretty good golfer, to say the least. Me and Tiger show up out at, let's say – I don't know what it's called anymore – Three Putts. That's what I always knew it as at the golf course, and we're going to play nine holes.

Is it possible that I would win? Possible. Maybe his arm falls off. You never know, everything and anything is possible. Is it reasonable to believe that I would win? No. No, not at all. You understand the difference? What's reasonable and what's possible? I have to prove this case beyond a reasonable doubt, alright?

There was no objection at the time of this utterance, and voir dire continued as normal.

Later during the Commonwealth's case-in-chief, Backstrom was called to the stand. She testified to substantially the same events as recounted above, to wit: that she had seen Moody and Smith a week prior in Belk; that she had believed Smith to be attempting to steal items in her purse and began to follow her around under the guise of providing customer service; that Smith removed the items from her purse and dropped them on the floor; that Smith and Moody then left the store together; and that on October 25, 2018, she saw Smith enter the store again, recognized her from the prior incident, and called Theron Rowe.

This testimony is of some controversy. It was the focus of a pretrial motion in limine by Moody, and the merits were argued and considered by the court the morning of trial prior to seating the jury. Moody's objection to this

4

testimony was renewed during trial. The motion denied; the objection overruled; the testimony was heard. Immediately after, the trial court admonished the jury, which we quote in full:

> You have now heard some evidence which I am required to give specific directions on how it can and cannot be used. Your task as the jury in this case is to decide what happened at the Belk store on October 25, 2018. The law does not allow what is called character evidence. If someone did something on a prior date, that cannot be used as character evidence to predict what they would do on a later date. But sometimes evidence of a prior act can be proper evidence to consider for limited reasons. In this case, you have now heard evidence about an alleged prior visit to the Belk store by the Defendants one week prior to October 25th. You shall not consider that evidence for any purpose other than to show, if it does, a motive, intent, preparation, a plan or knowledge of the Defendants relating to their actions on October 25th.

After a three-day trial the jury found Moody guilty. He now brings this appeal arguing chiefly that Backstrom's testimony of the prior incident at Belk unduly prejudiced the jury as it was impermissible character evidence of a prior bad act. This issue was preserved by the pre-trial motion in limine and contemporaneous objection at trial. He also argues that the Commonwealth impermissibly defined reasonable doubt during voir dire, thereby committing a palpable error. He seeks our review on this latter issue, but concedes it is not preserved.

In turn, the Commonwealth argues that the testimony of the prior incident at Belk was not impermissible character evidence used to prove character or criminal disposition, but rather was permissibly used to show knowledge and intent; but in any event did not unduly inflame the passions of the jury. Regarding the voir dire statement, the Commonwealth argues it was

5

not a palpable error, and that the Commonwealth is permitted to define what reasonable doubt is by way of negation.

## II. Standard of Review

We employ two different standards for the separate issues involved in this appeal. First, regarding the argument of prior bad acts under KRE 404, we review evidentiary rulings under an abuse of discretion standard. *Kerr v. Commonwealth,* 400 S.W.3d 250, 261 (Ky. 2013). Thus, we defer to evidentiary rulings except when "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

Second, regarding the argument of defining reasonable doubt, we undertake palpable error review. "A palpable error which affects the substantial rights of a party may be considered by … an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr 10.26. "To find manifest injustice, the reviewing court must conclude that the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Conrad v. Commonwealth,* 534 S.W.3d 779, 783 (Ky. 2017) (quoting *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky. 2006)).

## III. Analysis

### A. The Evidence of the Prior Bad Act was Permissible to Demonstrate Moody's Knowledge

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible: (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

KRE 404(b)(1). Thus, the criminal conduct or prior bad act must be "probative of an issue independent of character or criminal predisposition, and only if its probative value on that issue outweighs the unfair prejudice with respect to character," will it be admissible. *Billings v. Commonwealth,* 843 S.W.2d 890, 892 (Ky. 1992). But the exclusionary nature of this rule demands that it be strictly construed, with trial courts applying the "rule cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Bell v. Commonwealth,* 875 S.W.2d 882, 889 (Ky. 1994). And though our review is one for abuse of discretion, we have nonetheless developed a three-part inquiry to determine whether an abuse has in fact occurred, looking to the proffered evidence's relevance, probativeness, and prejudice. *Id.*

The first inquiry simply asks if the prior bad act was relevant to any other factor other than character or criminal disposition. "In reviewing relevance, courts must determine that the 'other bad acts' evidence is offered to prove material facts that are actually in dispute." *Leach v. Commonwealth,* 571 S.W.3d 550, 554 (Ky. 2019). KRE 404(b) gives a non-comprehensive list of material factors that might be assessed, and in this case the relevance inquiry looks to whether the prior bad act goes to demonstrate knowledge and intent.

7

At trial, a crucial fact for Moody was whether he knew Smith was entering the Belk store to shoplift or if he thought she was innocently shopping. An element of robbery in the first-degree is that one be armed with, or use, or threaten the use of, a deadly weapon or instrument with "intent to accomplish the theft . . ." KRS 515.020(1). Since, perforce, one must have knowledge of a crime if they intend to accomplish it, not only was knowledge and intent an element the Commonwealth had to prove, but lack thereof became a cornerstone of Moody's defense.

Moody said he had not been with Smith on the prior bad act that Backstrom testified about. He also said he did not know she had been shoplifting on October 25th until they were in the van and fleeing the scene. Instead, his testimony was that he saw Smith struggling with Rowe, and as far as he was concerned it was an unidentified man assaulting his girlfriend and he was acting in her defense when he pulled the gun on Rowe and demanded Smith be released. The jury did not accept this account of events.

Clearly, no dispute exists about Moody's actions in themselves. He did draw a handgun on Rowe, aimed it at him, and demanded Smith's release. The prior bad act did not make any of these facts more or less material, nor did they tend to demonstrate Moody's character or criminal disposition. Rather, it served to illuminate whether he was acting in legitimate defense of his believed-to-be-innocent girlfriend or was knowingly attempting to help effectuate her escape from a crime scene. This was a material fact as it was relevant to prove Moody's knowledge. Therefore, the relevance inquiry is satisfied.

8

The second inquiry is probativeness. "[T]he trial court must determine if the evidence of the uncharged crime is sufficiently probative of its commission by the accused to warrant its introduction into evidence. It is sufficiently probative if the trial judge believes 'the jury could reasonably infer that the prior bad acts occurred and that the defendant committed such acts.'" *Leach v. Commonwealth*, 571 S.W.3d at 554 (quoting *Parker v. Commonwealth,* 952 S.W.2d 209, 214 (Ky. 1997)).

From the dual testimony of Backstrom—that she remembered Moody and Smith attempting to shoplift a week prior and the details of said incident—and the testimony of Theron Rowe—that he was called on the day of October 25th by Backstrom because she recognized Smith—the jury could make a reasonable inference that the prior shoplifting attempt did occur and was perpetrated by Moody and Smith. There is no basis for this Court to find an abuse of discretion as concerns the probativeness inquiry.

Moody, in the Circuit Court below, made much of the fact that Backstrom had omitted the prior shoplifting incident in her written statement, and upon that ground insisted that the trial court should disallow her testimony. But such an argument fails to reckon with the history of the reasonable inference standard for probativeness. As Professor Lawson recounts, "in most instances other crimes evidence is mere testimony by one or more witnesses that the defendant committed the uncharged crime, making it somewhat harder to believe that the accused committed the uncharged crime and creating at least some concern about use of the other crime to prove the

9

charged offense." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.30[2][c], at 137 (5th ed.). In light of this concern, "courts seem to have universally recognized the need for some kind of safeguard against the use of *unsubstantial evidence* of a defendant's involvement in 'other crimes.'" *Id.* at 138. This led to chaos in the law as various jurisdictions used differing tests, i.e., preponderance of evidence, substantial evidence, clear and convincing evidence, etc., to determine whether such other crimes evidence could be admitted. *Id.*

But then the Supreme Court of the United States announced the reasonable inference standard for federal courts. *Huddleston v. United States*, 485 U.S. 681 (1988). This Court embraced that same standard in *Parker v. Commonwealth*, 952 S.W.2d at 214. Thus, under the reasonable inference standard, "the trial court neither weighs credibility nor makes a finding that the [Commonwealth] has proved the conditional fact . . ." *Huddleston,* 485 U.S. at 690. If there was a question of Backstrom's credibility, it was a question solely for the jury. The trial court acted properly in declining to usurp this prerogative.

Finally, the last inquiry is prejudice. A prior bad act is always prejudicial when it is introduced for an improper purpose or to inflame the passions of the jury. *Leach,* 571 S.W.3d at 554. On the other hand, all evidence of this nature is assumed to be prejudicial; thus, a balancing test is normative and the court asks "is the tendency of the evidence so strongly to lead the jury into improper character inferences that that tendency 'substantially outweighs the evidence's

10

probative value' with regard to its proper uses?" *Jenkins v. Commonwealth*, 496 S.W.3d 435, 457 (Ky. 2016) (quoting *Bell v. Commonwealth*, 875 S.W.2d at 890).

In this case, the purpose for introducing the prior shoplifting attempt was not improper but was used to demonstrate knowledge and intent. Neither did it serve to inflame the jury's passions. Although there is some similarity in the two incidents in this case, a reasonable person will understand the difference in kind between run-of-the-mill shoplifting and armed robbery. The prior incident did not seek to paint Moody as especially violent or dangerous. Indeed, it could not have had that effect. We do not believe the modicum of prejudice stemming from introducing the prior act of inchoate, ordinary shoplifting inflamed the jury, nor did it substantially outweigh the probativeness said act had into the knowledge and intent of Moody for the charged crime of robbery in the first degree.

Having undertaken the necessary inquiries, we are satisfied that the trial court properly admitted the evidence of the prior bad act. There was no abuse of discretion as the evidence was relevant, probative, and that probativeness was not substantially outweighed by the prejudice all such evidence carries.

Nonetheless, we emphasize that the trial court admonished the jury as to the proper consideration it had to give to the evidence, especially noting that "[i]f someone did something on a prior date, that cannot be used as character evidence to predict what they would do on a later date." Instead, the trial court accurately informed the jury that it "shall not consider that evidence for any

11

purpose other than to show, if it does, a motive, intent, preparation, a plan or knowledge of the Defendants relating to their actions on October 25th."

We have previously stated that "a trial judge must consider whether a clear instruction limiting the jury's use [of prior bad act evidence] to its *proper* purpose is likely to be effective." *Bell,* 875 S.W.2d at 890. This is because "protection against . . . unfair prejudice emanates not from a requirement of a preliminary finding by the trial court . . ." but from several other factors, *inter alia,* a limiting instruction to the jury. *Huddleston,* 485 U.S. at 691-92. It is evident that the trial judge believed a limiting instruction was necessary and effective. We are satisfied that the clear and correct statement of the trial court, following immediately upon the heels of the testimony in question, sufficiently ameliorated any undue prejudice the testimony might have led to. There was no error under KRE 404(b) in admitting the testimony of Backstrom.

## B. The Defining of Reasonable Doubt Did Not Lead to Manifest Injustice

"Instructions [from the court] should not attempt to define the term 'reasonable doubt.'" RCr 9.56(2). Extending that rule, we have held that "trial courts shall prohibit counsel from *any* definition of 'reasonable doubt' at any point in the trial . . ." *Commonwealth v. Callahan,* 675 S.W.2d 391, 393 (Ky. 1984). But in so doing, we have "rejected the notion that any such error in defining reasonable doubt was *per se* prejudicial and not subject to harmless error analysis." *Cuzick v. Commonwealth,* 276 S.W.3d 260, 267 (Ky. 2009). *See also Johnson v. Commonwealth,* 184 S.W.3d 544, 551 (Ky.

12

2005) (noting that "[w]e have applied harmless error on this precise issue, even in capital murder cases, each time affirming a conviction and sentence of death."). Finally, we have rejected the proposition that defining reasonable doubt constitutes an error of constitutional magnitude or rises to palpable error. *Commonwealth v. Goforth*, 692 S.W.3d 803, 805 (Ky. 1985).

Nevertheless, we have held that where "the attorney for the Commonwealth engaged at length in a discussion of reasonable doubt," and "us[ed] himself as a hypothetical witness to an accident and suggested to the prospective juror that his hypothetical testimony would satisfy the 'reasonable doubt' standard, but might not eliminate any possibility of doubt," and "explained that there was a significant distinction between being convinced beyond a reasonable doubt and being convinced beyond all or a shadow of a doubt," then there was reversible error. *Marsch v. Commonwealth*, 743 S.W.2d 830, 832 (Ky. 1987).

Moody understandably analogizes his case to that of *Marsch*. And indeed, there are similarities. There is the giving of a hypothetical and a somewhat lengthy exposition, although the colloquy in the case *sub judice* was only approximately 1 minute and 30 seconds long. But that is where the similarities cease. The Commonwealth has sought to distinguish the case based on the hypotheticals offered here and in *Marsch* but that is unnecessary. An inept attempt to demonstrate the difference between "beyond reasonable doubt" and "beyond any doubt," using an absurd hypothetical involving Tiger Woods at putt-putt golf, does not strike this Court as an error that is "shocking or

13

jurisprudentially intolerable." *Conrad,* 534 S.W.3d at 783. We are persuaded, and continue to hold, that this error is not one that is a manifest injustice. *Goforth,* 692 S.W.3d at 805.

What is crucial here is not the colloquy itself or in what manner it was conducted; it is the standard of review. We have twice before ruled that even in Capital cases, an unpreserved error on improperly defining reasonable doubt is not a sufficient ground to find that absent the error the defendant might not have been found guilty or had the death penalty imposed. *Caudill v. Commonwealth,* 120 S.W.3d 635, 675-76 (Ky. 2003); *Sanders v. Commonwealth,* 801 S.W.2d 665, 671 (Ky. 1990). Even Justice Leibson found the distinction between differing standards of review compelling. *Johnson,* 184 S.W.3d at 555 (Leibson, J., dissenting). In this case, the Commonwealth's attorney may well have made a poor attempt at apophasis, but it was not palpable error. Finding no palpable error, we decline to address whether an attempt to define reasonable doubt by stating what it is not, i.e., by negation, is allowable under RCr 9.56 and current caselaw.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in admitting the prior bad act testimony under KRE 404(b) nor was there palpable error in the Commonwealth's attempt at defining reasonable doubt. Moody's conviction is affirmed.

All sitting. All concur.

14

COUNSEL FOR APPELLANT:

Erin Hoffman Young
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Robert Baldridge
Assistant Attorney General